WALNUT REALTY COMPANY, PETITIONER-APPELLANT, v. DIRECTOR, DIVISION OF TAXATION AND DIVISION OF TAX APPEALS IN THE STATE DEPARTMENT OF THE TREASURY, RESPONDENTS-RESPONDENTS.

Argued October 10, 1961—Decided January 22, 1962.

*Mr. Bertram Polow,* attorney and of counsel, argued the cause for petitioner-appellant (*Mr. John M. Newman,* on the brief).

*Mr. Alan B. Handler,* Deputy Attorney General, of counsel, argued the cause for respondents-respondents (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

SCHETTINO, J.   Petitioner, Walnut Realty Company, (hereafter referred to as Walnut) seeks to reverse a judgment of the Division of Tax Appeals which held the company subject to franchise taxes at the rates provided for a "financial business" rather than at the lower rates specified for a general business corporation.   While the appeal was pending before the Appellate Division, we certified the matter on our own motion.   *R. R.* 1:10–1(a).

For the years 1952 through 1957 Walnut filed corporate franchise tax returns and paid annual taxes under the claim that it was a real estate business and therefore taxable as a general business corporation under the Corporation Business Tax Act.   *L.* 1945, *c.* 162; *N. J. S. A.* 54:10A–1 *et seq.* Although no objection was originally made to the method

used for computing the tax, the Director of the Division of Taxation reviewed those returns in 1957 pursuant to *N. J. S. A.* 54:10A–19.1, determined that Walnut was engaged in a "mortgage financing business" within the definition of a "financial business" in the Financial Business Tax Law (*L.* 1946, *c.* 174, § 2; *N. J. S. A.* 54:10B–2), and accordingly issued a deficiency notice for additional taxes for the years 1952 through 1957.

In 1958 Walnut paid under protest the calculated additional assessments plus interest and filed a petition of appeal with the Division of Tax Appeals. In April 1959 while that appeal was pending, Walnut tendered, again under protest, its tax for the year 1958 calculated as required by the Financial Business Tax Law.

No formal petition of appeal from the assessment for 1958 was ever filed but in March 1960 Walnut orally moved to amend its original petition to include an appeal for 1958. The motion was denied by the Division of Tax Appeals. Walnut appeals from that ruling and from the determination that it is a financial business. In addition to contending that it is not a financial business, it argues that it relied to its detriment upon the State's acceptance of its initial returns. Further, it asserts that the Financial Business Tax Law denies it the equal protection of the laws provided by the Fourteenth Amendment to the *Federal Constitution.*

An analysis of Walnut's business becomes necessary. Some of its activities are concerned with real estate interests and others with mortgage loans. Understandably, Walnut places heavy emphasis upon the real estate aspects.

Organized in 1920 under the laws of New Jersey for the purpose of taking title to real estate, it was then and is now a two-family enterprise. The amount of realty held by it has varied from time to time, but during the tax years in question the only real estate it owned was a commercial building on Halsey Street, Newark. Walnut also held a leasehold interest in a commercial building on Lyons Avenue, Irvington, during this period. Up to eleven tenants occupied

space in the Newark building, but the number of subtenants in the Irvington leasehold does not appear in the record.

Our attention is directed to the fact that gross rentals exceeded annually the gross interest income from its mortgage investments. We note in passing, however, that no net income figures were provided. Furthermore, the record indicates that Walnut obtained discounts on a number of its mortgage loans, but it is not clear how much such discounts would add to the annual mortgage income figures.

Walnut's vice-president testified that in his opinion the fair market value of the land and building on Halsey Street was $175,000 in 1960. The assessed valuation of that property for tax purposes was $57,000 for the latter years in question. No figures are listed regarding the value of the leasehold interest, but the percentage of Walnut's gross income attributed to rentals from that property fluctuated between 2.51% and 6.26% from 1953 through 1956 and was 3.8% in 1956, the last year for which these figures are reported. With combined rentals from both properties representing slightly more than 50% of the company's total gross income each year, it seems unlikely that the fair market value of the leasehold was as great as that of the Halsey Street property. In comparison, the capital investment in mortgage financing exceeded $300,000 through 1956 and still involved substantial sums of investment capital in 1957 and 1958.

Walnut's initial transactions in the area of mortgage financing involved the acquisition of purchase money mortgages on properties it sold. But mortgages on other realty were subsequently accepted as security for loans to friends of the families who owned the company and to persons recommended by friendly attorneys and accountants.

No argument is made that the company would not be taxable under the Financial Business Tax Law were these and similar transactions Walnut's sole form of business activity. Rather, the transactions are characterized by Walnut as an incidental adjunct to its "real estate business," nothing

more than an accommodation to friends and relatives. To support this contention it asserts that the business has not been listed in a telephone directory and has never advertised in any periodical as a mortgage and loan business or otherwise. In addition, all of its business is carried on in a private home, primarily by two stockholders who are over eighty years of age. Although these facts are persuasive (especially when viewed out of context) that no large scale attempt was made to corner the mortgage market, they fall short of being determinative as to the true character of the business for tax purposes under *N. J. S. A.* 54:10B-1 *et seq.*

In contrast to the relatively static nature of its real estate activities from 1952 through 1958, Walnut held during the same period a cumulative total of 25 mortgages which were the product of the various loan transactions already referred to. A number of the underlying debts were repaid in full, but other mortgages were acquired or renewed, causing the number owned at the end of each year to increase between 1952 and 1957. Thus, as of the end of 1952 Walnut owned 12; at the same time in 1953 the number was 14; in 1954, 16; in 1955, 18; and by the end of 1956, 20. None was acquired after 1956.

One of the mortgages held during the years in question was a purchase money mortgage acquired when Walnut sold a hotel in 1936 or 1937. The balance due thereon had been reduced to $12,600 by 1952 (the only year for which this figure was supplied). Another was a purchase money mortgage in the amount of $11,200 obtained in 1956 when Walnut sold a tax sale certificate it had acquired. But there is no assertion or evidence that any of the others was connected to petitioner's real estate activities.

While some of the capital used for mortgage loans represented profits from real estate activities, advancements by stockholders (reflected primarily in notes payable) were the main source of funds for this purpose. The following comparison of outstanding debts to stockholders and outstanding mortgage loans in the same year reveals the obvious trend:

|      | Balance Due from Mortgage Loans | Outstanding Debts Owing to Stockholders |
|------|---------------------------------|------------------------------------------|
| 1952 | $306,524                        | $226,000                                 |
| 1953 | 320,620                         | 240,000                                  |
| 1954 | 331,011                         | 258,000                                  |
| 1955 | 351,021                         | 276,000                                  |
| 1956 | 339,294                         | 296,660                                  |
| 1957 | 226,972                         | 226,000                                  |
| 1958 | 165,149                         | 92,000                                   |

And no attempt was made to repay the money borrowed from stockholders until 1957, the year the Director made his determination.

In view of the regularity of mortgage financing, the increasing amounts of capital so devoted and the direct acquisition of funds for this purpose, there is little doubt that Walnut had embarked upon a program calculated to keep its capital and that of its stockholders actively engaged in the mortgage market. Commercial aspects override the asserted "accommodation" characterization in light of the fact that petitioner charged interest on its mortgage loans at the rate of 6%; the principal amount of the mortgages was being amortized as opposed to being subject to payment at the convenience of the borrowers; a number of the mortgage loans were negotiated subject to discounts; and attorneys and accountants who had clients in need of mortgage financing referred them to petitioner. At least in a limited circle then, the company was obviously known as an available source of mortgage financing capital.

Nor is Walnut's attempt to classify this activity as a favor to friends necessarily aided by its failure to use commercial advertising media. A financial business which is able to operate without the necessity for advertising expenditures is in an enviable position from a competitor's standpoint.

Based upon the substantial mortgage loan investments, the lack of connection between them and the company's real estate activities and the pattern of investments and reinvestments, we hold that petitioner was a mortgage financing business *in the ordinary sense of that term.* Cf. *State Tax*

*Commission v. Allied Mortgage Co.,* 175 *Md.* 357, 2 *A.* 2d 399, 400, 119 *A. L. R.* 585 *(Ct. App.* 1938). We do not suggest by so holding, however, that a direct connection between mortgage financing transactions and real estate activities would necessarily preclude classification as a mortgage financing business. Nor would such classification automatically follow in every case absent such connection. Express recognition of the latter fact is found in the statutory exception for "* * * the holding of bonds, notes, or other evidences of indebtedness by individual persons not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with the business of national banks * * *." *N. J. S. A.* 54:10B–2(b). The effect of such connection or lack of it in any case will turn upon the peculiar facts.

Our conclusion that the company is a mortgage financing business as that term is commonly used brings it within the statutory definition. *N. J. S. A.* 54:10B–2; *Morris & Essex Invest. Co. v. Director, Div. of Taxation,* 33 *N. J.* 24, 34 (1960); *General Public Loan Corp. v. Director, Div. of Taxation,* 13 *N. J.* 393 (1953); 2 *Sutherland, Statutory Construction* § 4919, *pp.* 436–437 (3*d* ed. 1943).

An argument is advanced that the company should not be subjected to taxation as a financial business after 1956 because it acquired no mortgages after that date. But the statute provides that the tax shall be imposed upon every corporation "doing a financial business in this State * * *." *N. J. S. A.* 54:10B–3. Although no definition of that phrase is expressly provided, we are of the opinion that guides for interpreting its scope are found in the statutory history and legislative purpose.

The pertinent portion of *N. J. S. A.* 54:10B–2(b) provides:

" 'Financial business' shall mean all business enterprise which is (1) in substantial competition with the business of national banks and which (2) employs moneyed capital with the object of making profit by its use as money, through discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of

debt; buying and selling exchange; making of or dealing in secured or unsecured loans and discounts; dealing in securities and shares of corporate stock by purchasing and selling such securities and stock without recourse, solely upon the order and for the account of customers; or investing and reinvesting in marketable obligations evidencing indebtedness of any person, copartnership, association or corporation in the form of bonds, notes or debentures commonly known as investment securities; or dealing in or underwriting obligations of the United States, any State or any political subdivision thereof, or of a corporate instrumentality of any of them. This shall include, without limitation of the foregoing businesses commonly known as industrial banks, dealers in commercial paper and acceptances, sales finance, personal finance, small loan and mortgage financing businesses, as well as any other enterprise employing moneyed capital coming into competition with the business of national banks; * * *."

The history of the statute is set forth by Mr. Justice Proctor in *Morris & Essex Invest. Co. v. Director, Div. of Taxation, supra,* 33 *N. J.,* beginning at *p.* 27. It is there noted that in order to alleviate an obvious threat to the validity of our Bank Stock Act (*R. S.* 54:9–1 *et seq.*) the Legislature was desirous of developing a tax scheme to avoid a claim that national banks are subject to prejudicial tax treatment. A specific federal mandate is contained in 12 *U. S. C. A.* § 548(b) (1958) to avoid taxing the stock of national banks at a rate higher than that applied to moneyed capital employed in substantial competition with the business of national banks. *First National Bank of Shreveport v. Louisiana Tax Commission,* 289 *U. S.* 60, 65, 53 *S. Ct.* 511, 513, 77 *L. Ed.* 1030, 1034 (1933); *First National Bank of Guthrie Center v. Anderson,* 269 *U. S.* 341, 348, 46 *S. Ct.* 135, 138, 70 *L. Ed.* 295, 303 (1926). We also note that prior to passing the Financial Business Tax Law our Legislature had determined that other moneyed capital should not be afforded lower tax rates than those applicable to shares of the common stock of State banks. *L.* 1914, *c.* 90, § 1; *R. S.* 54:9–1 and 2.

When the New Jersey Commission on State Tax Policy made a preliminary study of the problem, it stated that the federal law:

"\* \* \* establishes, under modern business practices, a standard which must refer to the credit market generally if it is to be administered in a practical way. It would be difficult to show that any single business, except another bank, comes into direct competition with a national bank. There is no more a single business in substantial competition with a national bank, than there is a single business in substantial competition with a grocery store. It is true that tax equality requires that there be no more discrimination as between financial businesses than there should be as between retail businesses. But tax equality cannot be related to the *degree of competition* of a single business but only to the common characteristics of the businesses which form the base of the tax. The truth seems to be that national banks compete substantially with many businesses, including the whole credit market in which they operate. That is to say, a quantitative definition of competing business is not practical, but the quantitative treatment of *capital* in competition is a practical measure." *First Report of the Commission on State Tax Policy,* *pp.* 18–19 (1946).

With respect to effectuating this policy the Commission concluded at page xix of the *First Report:*

"1. THAT THE FOLLOWING FINANCIAL INSTITUTIONS CONSIDERED AS A GROUP, REPRESENT SUBSTANTIAL MONEYED CAPITAL IN COMPETITION WITH NATIONAL BANKS WITHIN THE INTENT OF \* \* \* [18 U. S. C. § 528] AND SHOULD BE REMOVED FROM THE PRESENT EXEMPTION IN ORDER TO SATISFY THE REQUIREMENTS OF THE FEDERAL RULE:
A. *Shares of stock in the following types of corporate enterprise:*
\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
6. Mortgage loan companies"

And as pointed out in *Morris & Essex Invest. Co., supra,* 33 *N. J.,* at *p.* 33, the statement appended to *Assembly Bill* 283 (1946), which later became the statute, contained the following language:

"The purpose of this act is to carry out the recommendations contained in the First Report of the Commission on State Tax Policy (submitted February 28, 1946)."

Viewing the tax scheme as a whole we are of the opinion that the Legislature sought to eliminate possible

bases for invalidating the Bank Stock Tax Act on a claim that the tax structure discriminates against national banks. To this end it included mortgage investment companies as a class. Emphasis throughout the act is placed upon the employment of moneyed capital in competition with national banks. And the intent of the Legislature in taxing mortgage financing businesses as a class evidently followed its opinion that those businesses as a group did employ moneyed capital in competition with the business of national banks. . The phrase "doing a financial business," must be interpreted in this context (*R. S.* 1:1-1) and to serve the manifest legislative intent and the spirit of the law. 3 *Sutherland, Statutory Construction* (*3d ed.*) § 6703, *n.* 1 (*Supp.* 1960).

█ Aside from the question whether it was *doing* a financial business after 1956, Walnut was no less a mortgage financing business merely because it did not make a new loan in any one year. It continued to operate for a profit and continued to reap the benefits of its mortgage financing. Furthermore, there is no evidence that it could not again begin investing in mortgage loans at any time, or, for that matter, that it made any attempt to divest itself of its mortgage investments. Thus, the company was also a "financial business" after 1956 as that term is used in the statute. *Morris & Essex Invest. Co., supra.*

As long as substantial sums of money originally invested in competition remain invested in mortgage loans, they are employed in competition with the business of national banks; for money so invested ties up a market otherwise available to the business of such banks. If a corporation could invest $1,000,000 in a number of three-year mortgages and then be held taxable at rates below that of national banks for the latter two years, that tax treatment would be prejudicial to national banks throughout the period. The investments of national banks as reflected in stock values would be taxable at the higher Bank Stock Act rate while the corporation would be taxable at the lower Corporation

Business Tax Act rate. Therefore, in the light of the statutory context and the legislative objective, we are of the opinion that Walnut's continued employment of substantial amounts of moneyed capital and collection of interest on capital so employed in 1957 come within the meaning of "doing a financial business."

Respondent contends that the Division of Tax Appeals properly refused to consider petitioner's status with respect to the calendar year 1958, and impliedly, therefore, that we should not now make a determination with respect to that year. According to the Director, Walnut should have initiated an appeal for that year in accordance with the provisions set forth in *N. J. S. A.* 54:51–1. We find no necessity to pass upon the issue at this time; for even if the appeal were properly before us, the result we reach as to 1957 would require us to affirm the assessment made by the Director of the Department of Taxation for the year 1958.

Walnut contends that the Director should not be allowed to effect any "reclassification" because it relied to its detriment upon the absence of any objection to its original franchise tax returns. However, the Corporation Business Tax Act provides that "no assessment of additional tax [under the act] shall be made after the expiration of more than five years from the date of the filing of a return." *N. J. S. A.* 54:10A–19.1(b). And no similar time limitation is found in the Financial Business Tax Law. Thus there is clearly no statutory support for the company's position. And it is the province of the Legislature to provide such periods of limitation.

Nor does the case law support Walnut's argument. In *Lockwood v. Walsh,* 137 *N. J. Eq.* 445 (*Prerog.* 1946), a reassessment of the amount of tax due upon an estate was held void where the Transfer Inheritance Tax Bureau acted five years after its original express determination of the tax due. But the estate there had been substantially administered two years prior to the redetermination by

the Bureau. No analogous determination was made by the Director in the instant case prior to 1957.

In *State v. Erie Railroad Co.*, 23 *N. J. Misc.* 203, 42 *A. 2d* 759 (*Sup. Ct.* 1945), a railroad disputed an assessment levied against it and paid annually only that part which it contended it owed. At the same time it directed that such payments be credited to principal each year rather than to interest on the disputed unpaid amount. Acceptance of the payments and application in accordance with the railroad's directions were held insufficient to form a basis for the reliance necessary to prevent the State from later claiming such payments were applicable first against interest due.

We reach a similar result with regard to the acceptance of petitioner's returns by the Director. Until the Director reviewed those returns and notified petitioner of the increased assessment due, no administrative determination had been made upon which petitioner could reasonably rely. Our conclusion is supported by *Bayonne v. Murphy & Perrett Co.*, 7 *N. J.* 298, 311 (1951), where municipal officials twenty years earlier had determined without authorization that a tax due was too small to collect. That fact did not prevent the subsequent collection of the proper tax by the municipality. *A fortiori* then, the Director cannot be prevented from collecting the proper tax owing to the State where a taxpayer has failed to comply with its statutory duty to file proper returns and where no earlier determination has been made. In the instant case, the Director acted not to correct a prior erroneous determination but merely to determine for the first time that petitioner was erroneously filing its returns under the Corporation Business Tax Act instead of under the Financial Business Tax Law.

█ Walnut argues that to hold mortgage investment businesses taxable as a class when other businesses are taxed only if they are determined to be employing moneyed capital in competition with the business of national banks

is to deny it equal protection of the laws in violation of the Fourteenth Amendment to the *Federal Constitution*. Pointing to what it deems as the legislative objective, *i. e.*, to remedy tax inequalities between competing federal and local moneyed capital, Walnut contends that there is no reasonable relation between the classification and the purpose of the act. As previously set forth in this opinion, however, the legislative purpose was of broader scope. The objective was to protect the validity of our Bank Stock Tax Act by eliminating possible bases for a holding that our tax structure discriminates against national banks.

In view of the legislative history it is likely that the Legislature was of the opinion that the federal mandate was directed at the effects which a group of similar businesses would have on the credit market. With this in mind it is clear that the inclusion of mortgage investment companies is reasonably related to the statutory purpose. As we said in *Wiramal Corp. v. Director of Division of Taxation*, 36 *N. J.* 201, 210 (1961), "the Legislature has a wide discretion in formulating tax laws as well as tax exemptions, *General Electric Co. v. Passaic*, 28 *N. J.* 499 (1958); and its power to classify for purposes of taxation permits appropriate 'flexibility and variety.' *Allied Stores of Ohio v. Bowers*, 358 *U. S.* 522, 526, 79 *S. Ct.* 437, 3 *L. Ed. 2d* 480, 484 (1959)." It is not sufficient to say that another method would serve the statutory aim more efficiently. *Two Guys from Harrison v. Furman*, 32 *N. J.* 199, 218 (1960); *N. J. Restaurant Ass'n. Inc. v. Holderman*, 24 *N. J.* 295, 300 (1957).

Affirmed. No costs.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.